UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL MERENESS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 1:15-cv-43 SNLJ |
| | ) | |
| UNITED STATES OFFICE OF | ) | |
| PERSONNEL MANAGEMENT, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM and ORDER

On March 18, 2015, plaintiff Michael Mereness filed this lawsuit against the United States Office of Personnel Management ("OPM") alleging that OPM had breached its contract with him by wrongfully denying insurance coverage for his son, N.M.. Both parties have filed for summary judgment, and the motions are now fully briefed and ripe for disposition.

I.  **Factual Background**

The facts of this matter are uncontested except where indicated.

Plaintiff Michael Mereness was at all relevant times an employee of the United States government and a participant in the Compass Rose Health Plan (the "Plan"), which provides health benefits to eligible employees and their families under the Federal Employees' Health Benefits Act, 5 U.S.C. §§ 88901-8914 ("FEHBA"). Under the FEHBA, the United States Office of Personnel Management ("OPM") contracts with

1

qualified insurance carriers (such as the Compass Rose Health Plan) to provide health benefits to federal employees. The FEHBA requires contracting insurance carriers like the Plan here to pay for or provide any health services or supplies to which OPM determines that the insured is entitled. 5 U.S.C. §§ 8902(d) & (j).

Plaintiff's Plan provided health benefits for himself and his enrolled son, N.M. In 2012, plaintiff and N.M. were eligible for benefits in the Compass Rose Plan. N.M. suffers from mental health problems and has been diagnosed with Bipolar Affective Disorder Type II, Attention Deficit Hyperactivity Disorder Combined Type ("ADHD"), and Reactive Attachment Disorder. N.M.'s diagnoses relate in large part to trauma N.M. suffered as a small child, before he was adopted from Russia by his American parents. N.M. was removed from the custody of his drug-addicted biological mother when he was a year old, after having been left alone for three days. He suffered from numerous interpersonal problems both with his adopted family and his school teachers, administrators, and peers.

At age 14, and after other interventions were unsuccessful, N.M. was admitted into the Change Academy Lake of the Ozarks ("CALO") on May 11, 2012. CALO is a residential treatment facility specializing in treatment of attachment, trauma, and emotional disturbances. At the time of N.M.'s admission, his estimated discharge date was September 30, 2013, which would have constituted nearly 17 months of inpatient treatment. N.M. was actually discharged on August 2, 2013, after 449 days of treatment.

At some point,[1] plaintiff received notice from InforMed, the administrator for the Plan, that N.M. was approved for the inpatient residential program at CALO for only 65 days, from May 11 to July 15, 2012.

Plaintiff appealed that decision with InforMed, the Plan administrator. InforMed began the process of reviewing the necessity of N.M.'s treatment at CALO. InforMed retained an independent psychologist who reviewed 89 pages of CALO records concerning N.M.'s treatment from May 4 through October 31, 2012. The psychologist determined that continued stay in an inpatient residential program beyond July 15, 2012 was not medically necessary for N.M. because he "does not present an ongoing threat of harm or injury to self or others." On September 24, 2013, a Nurse Reviewer on behalf of the IMMS[2] Medical Director informed plaintiff that his request for an inpatient residential program for N.M. had been reviewed by the Medical Director, who determined that the "requested benefits [did] not meet the Plan's criteria for medical necessity under the exclusions/limitations section of the Plan's Summary Plan Description…." Plaintiff appealed that decision on March 3, 2014. The appeal was denied on May 2, 2014. That letter stated that N.M.'s

> continued stay in an inpatient residential program beyond 7/15/12 was not medically necessary. The patient is noted to have occasional problems with anger, impulsivity, aggression, and interpersonal conflict. However, these episodes were of a low enough frequency and severity that continued, long

---

[1] It is not entirely clear on what date plaintiff was informed that N.M.'s residential stay at CALO was approved through July 15, 2012 and no further. It appears that the Plan approved N.M. for residential treatment at the outset for only 65 days.

[2] The term "IMMS" is not defined, but the Court presumes IMMS is related to InforMed, the Plan's administrator.

term residential treatment was not medically necessary. The patient's care could have been safely delivered in a less restrictive setting, which is always a priority in treatment. The physician providing the review of your appeal was neither an individual who was consulted in connection with the original denial of your claim nor the subordinate of such individual.

A covered individual whose claim has been denied by a carrier must appeal to OPM before bringing a civil action seeking review of such denial. 5 C.F.R. § 890.107(c). Plaintiff thus requested an independent medical review of InforMed's denial on September 2, 2014. At OPM's request, a Medical Review Analysis Report was issued by Dr. Michael E. McManus, who is Board Certified in Child and Adolescent Psychiatry. The questions posed for review were:

> (1) Based upon the clinical documentation and the Plan's definition, was it medically necessary for the patient [sic] continue treatment at a residential treatment facility from July 16, 2012 to August 2, 2013? If yes, during what dates was treatment at this level medically necessary?
>
> (2) Could the patient have been safely, adequately and effectively treated at a lower level of care? If so, what dates apply?

Dr. McManus's response, in its entirety, was that

> (1) No, the Plan definition is not met and the continued treatment at a residential treatment facility from July 16, 2012 to August 2, 2013 was not medically necessary for this patient…. This patient's care could have been provided at a lower level of care from 7/16/12 forward.
>
> (2) Yes. From July 16, 2012 forward, the patient could have been safely, adequately and effectively treated at a lower level of care. By July 16, 2012, the patient had been stabilized on his medications for ADHD and Bipolar Disorder. There is no evidence in the medical records from July 16, 2012 forward that the patient was experiencing symptomatology of ADHD or Bipolar Disorder that required intensive 24 hour treatment and supervision associated with Residential Treatment. The patient was noted to have chronic interpersonal difficulties associated with his Reactive Attachment Disorder. During his two months in Residential Treatment, the patient's interpersonal difficulties and problematic behaviors had improved.

4

> The medical record indicates extended periods of behavioral stability with intermittent behavioral problems which were manageable and did not require seven day a week/24 hour per day supervision associated with Residential Treatment. The patient's interpersonal problems are chronic and are likely to require ongoing treatment and are unlikely to resolve in the context of Residential Treatment.

OPM concurred with Dr. McManus's conclusion. OPM thus informed plaintiff that OPM could not direct the Plan to provide additional benefits for N.M.'s treatment at CALO beyond July 15, 2012 because "confinement at the residential treatment level was not medically necessary" as defined by the Plan. Plaintiff filed this lawsuit against OPM on March 18, 2015, bringing two counts:

> **Count I**: plaintiff claims OPM wrongfully denied continued coverage of N.M.'s residential treatment at CALO by deeming the treatment not medically necessary.
>
> **Count II**: plaintiff claims that OPM violated the Mental Health Parity and Addition Act of 2008 ("MHPAEA") by not providing mental health coverage that is not comparable to the physical health benefits under the Plan, which is required under the MHPAEA.

The parties have filed cross-motions for summary judgment. Although neither of plaintiff's counts refers to the Administrative Procedures Act, that Act states that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. Plaintiff states in his complaint that he brings the action under the Federal Employees Health Benefit Act, 5 U.S.C. § 8901 *et seq.*, and there is no dispute that the Administrative Procedures Act applies to this Court's administrative review of OPM's decision.

## II. Legal Standard

Pursuant to the Administrative Procedures Act, 5 U.S.C. § 702, this Court conducts a "searching and careful" review of the administrative record in the case to determine whether the agency's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *S. Dakota v. Ubbelohde*, 330 F.3d 1014, 1027 (8th Cir. 2003) (quoting *Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)); 5 U.S.C. § 706(2)(A). This standard of review is quite narrow, and the Court "is not empowered to substitute its judgment for that of the agency." *Overton Park*, 401 U.S. at 416. "To have administrative action set aside as arbitrary and capricious, the party challenging the action must prove that it was willful and unreasoning action, without consideration and in disregard of the facts or circumstances of the case." *Bradley v. Bureau of Alcohol, Tobacco & Firearms*, 736 F.2d 1238, 1240 (8th Cir. 1984) (internal quotations omitted). Moreover, this Court must afford "substantial deference to an agency's interpretation of its own regulation," which the Court must uphold unless that regulation violates the Constitution or federal statute or unless the interpretation is "plainly erroneous or inconsistent with the regulation." *Falk v. United States ex rel. Dep't of the Interior*, 452 F.3d 951, 953-54 (8th Cir. 2006) (quoting *Coalition for Fair & Equitable Regulation of Docks on Lake of the Ozarks v. F.E.R.C.*, 297 F.3d 711, 778 (8th Cir. 2002)). However, the Supreme Court has articulated that, under the arbitrary and capricious standard, the "agency must articulate a rational connection between the facts found and the choice made" to be upheld. *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974).

Pursuant to Federal Rule of Civil Procedure 56(a), a district court may grant a motion for summary judgment if all of the information before the court demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

**III. Discussion**

At the outset, despite plaintiff's couching of his claim as "breach of contract," the Court will proceed with Count I as a claim for administrative review of OPM's decision to deny residential treatment for N.M. after July 15, 2012. Furthermore, plaintiff concedes that his claim under the Mental Health Parity and Addiction Act of 2008 (Count II) is untenable in light of the fact that the Plan does indeed cover residential treatment for mental health.

OPM contends that its decision to deny coverage for N.M.'s residential treatment after July 15, 2012 is not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. After reviewing the Plan's denial of coverage and retaining its own independent medical reviewer, OPM refused to direct the Plan to provide additional benefits for N.M.'s treatment at CALO beyond July 15, 2012 because "confinement at the residential treatment level was not medically necessary" as defined by the Plan.

The Plan defined "Medical necessity" as

Services, drugs, supplies, or equipment provided by a hospital or covered provider of health care services that we determine: 1) are appropriate to diagnose or treat your condition, illness or injury; 2) are consistent with standards of good medical practice in the United States; 3) are not primarily for the personal comfort of the patient, the family, or the provider; 4) are not part of or associated with the scholastic education or vocational training of the patient; and in the case of

7

inpatient care, cannot be provided safely on an outpatient basis. The fact that a covered provider has prescribed, recommended, or approved a service, supply, drug or equipment does not in itself make it medically necessary.

OPM's decision was based on a Medical Review Analysis Report issued by Dr. Michael E. McManus, who is Board Certified in Child and Adolescent Psychiatry. After reviewing 1,657 pages of N.M.'s medical records from CALO as well as excerpts from Plan brochures and various correspondence, Dr. McManus concluded that N.M.'s residential treatment at CALO after July 15, 2012 was not medically necessary because treatment could have been safely, adequately, and effectively provided at a lower level of care, i.e., on an outpatient basis. To support this conclusion, Dr. McManus relied on the fact that

- N.M. had been stabilized on medications for ADHD and Bipolar Disorder;
- No evidence in the medical records showed N.M. was then experiencing symptoms of either ADHD or Bipolar Disorder that required intensive 24-hour treatment and supervision;
- With respect to N.M.'s Reactive Attachment Disorder, N.M.'s interpersonal difficulties and problematic behaviors had improved during his two months of residential treatment; and
- N.M. experienced extended periods of behavioral stability with intermittent behavior problems that were manageable and did not require residential/inpatient supervision.

Defendant also notes that N.M. required a "therapeutic hold or escort" on only eight occasions during his 449-day stay at CALO, which defendant contends supports that N.M.'s behavior was generally stable and had only intermittent, manageable behavior problems. In the regular shift notes, therapists described N.M.'s mood as "depressed" and/or "anxious" only ten times. N.M. attended bi-weekly individual and family therapy sessions in addition to numerous specialized group therapy sessions[3] on a weekly basis; defendant says the therapists did not note any significant problems[4] during those sessions.

The Court's analysis of whether the agency's decision is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" presents a narrow standard of review. *Ubbelohde*, 330 F.3d at 1027; *Overton Park*, 401 U.S. at 416. Plaintiff must prove that defendant's decision constitutes "willful and unreasoning action, without consideration and in disregard of the facts or circumstances of the case." *Bradley*, 736 F.2d at 1240. "Administrative action may be regarded as arbitrary and capricious only where it is not supportable on any rational basis." *First Nat. Bank of Fayetteville v. Smith*, 508 F.2d 1371, 1376 (8th Cir. 1974). As detailed above, OPM determined that N.M.'s stay beyond July 15, 2012 was not medically necessary as defined by the Plan because OPM believed that N.M.'s treatment could be provided safely on an outpatient

---

[3] Specialized therapy groups include groups for New Student Orientation, Mood Regulation, Self Concept, Attachment, and Grief and Loss; N.M. also attended "Team Therapy" and "Interdependence Therapy" groups throughout his 15-month stay.

[4] N.M.'s therapy notes for the sessions indicated appropriate behavior; the only negative notes, defendant says, involved the Mood Regulation sessions during which N.M. had some difficulty focusing and fed into peer negativity at times, but he was reported to have participated well in the group.

basis. That is, OPM concluded that N.M.'s care did not require 24-hour-per-day, seven-day-per-week care.

Plaintiff argues that OPM's decision runs counter to the evidence before it. In support, plaintiff highlights the numerous incidents of harm N.M. did to himself, ongoing thoughts of suicide, injury and harm to others, a need for escorts, and a need for extensive "coaching" to get through the day. The record showed that N.M. planned to hang himself the night of July 16, 2012 --- the very day N.M. would have been discharged under the Plan's determination. Although the medical record states that N.M. said the thought "started as a joke…it felt like a serious thought," and N.M. was placed on "safety closeness – harm to self" as a result. Including that date, N.M. had six incidents of self-harm and suicidal ideations through January 20, 2013. On May 4, 2013, in particular, N.M. punched a wall and broke his hand as a result. N.M. further caused harm to others on 19 occasions from September 16, 2012 through July 27, 2013. N.M. required "escorts" six times through July 21, 2013, and his behavior appeared to regress during treatment, as indicated by episodes during which he was unreceptive to coaching by staff, including on August 8, 2012; January 19, January 28, May 2, May 15, May 16, June 8, and July 4, 2013.

Defendant focuses on the fact that these episodes occurred over 449 days and that their frequency was thus relatively low. InforMed stated that N.M.'s "episodes were of low enough frequency and severity that continued long term residential treatment was not medically necessary." Plaintiff contends that N.M.'s need for "escorts" and "closeness" on various occasions (in addition to his several self-harm episodes) refute that statement.

OPM's psychiatrist's report opined that N.M.'s medical record indicated "extended periods of behavioral stability with intermittent behavioral problems which were manageable but did not require seven day a week/24 hour per day supervision associated with Residential Treatment." Plaintiff takes umbrage at the psychiatrist's description of N.M.'s problems as "intermittent" and argues that there is no "rational connection" between OPM's decision and the facts of N.M.'s psychiatric condition. *See Bowman Transp., Inc.*, 419 U.S. at 285, cited by *Hewitt v. U.S. Office of Pers. Mgmt.*, 390 F. Supp. 2d 685, 690 (N.D. Ill. 2005) (holding OPM arbitrarily and capriciously affirmed insurer's denial of hospitalization benefits to plaintiff). Instead, plaintiff contends that N.M.'s laundry list of harmful interactions and interventions reflected a serious danger to himself and others.

To start with, N.M.'s treating psychiatrist opined that N.M. posed a risk of harm to himself from July 17-28, 2012, of harm to himself and others from July 28-31, 2012 and September 16-18, 2012, and of harm to others on September 28-30, 2012. Defendant and its psychiatrist, Dr. McManus, do not substantively address those findings. Rather, defendant responds to this fact in plaintiff's statement of undisputed material facts by stating that although defendant admits the psychiatrist indicated N.M. needed "harm to self and others closeness" on 9/16-8/18 and "harm to others closeness" on 9/28-9/30, defendant denies that such an indication "supports the proposition that N.M. posed a harm to self and others on such dates." (#24 at ¶ 27.) Defendant does not explain this denial further or how a need for harm to self or others closeness does not indicate N.M. posed a harm to himself or others on those dates.

Next, with respect to defendant's statement that N.M.'s behavior problems were "manageable" because he needed a "therapeutic hold" only eight times, the American Academy of Pediatrics defines a therapeutic hold as "the physical restraint of a child by at least two people to assist the child who has lost control of behavior to regain control of strong emotions."[5] Thus, plaintiff's "intermittent behavioral problems" were "manageable" only through the use of at least two-person physical restraints.

Defendant points to the "majority" of N.M.'s therapy session notes ("case notes"), which describe N.M.'s mood as calm, content, and peaceful, and his behavior as attentive, oriented, alert, engaged, good eye contact, cooperative, honest, vulnerable, and confident. In fact, however, case notes repeatedly refer to violent episodes and N.M.'s struggle with his Reactive Attachment Disorder. Defendant chooses to focus on the case notes' headings, which describe N.M.'s mood and behavior *during therapy*. Defendant does not include descriptions of the case notes' "Assessments," which describe the subject matter addressed during therapy. Information conveyed in those Assessments is illuminating. For example, in a November 20, 2012 case note, the therapist wrote that she, N.M.'s parents, and a staff member "all discussed what was going on for Nick on the floor, as he appeared to be struggling," and he admitted to threatening and taunting staff. (OPM00989, #15-6 at 89.)[6] Defendant's statement of facts cites that case note but

---

[5] American Academy of Pediatrics, *The Use of Physical Restraint Interventions for Children and Adolescents in the Acute Care Setting*, Pediatrics (March 1997), available at http://pediatrics.aappublications.org/content/pediatrics/99/3/497.full.pdf (last visited Aug. 10, 2016).

[6] References to OPM_____ are references to the Administrative Record in this matter.

quotes only the heading on the case note with N.M.'s mood ("calm") and behavior ("attentive, oriented, alert, engaged, good eye contact, cooperative, honest, and vulnerable"). (#18 at ¶ 256.)

N.M.'s struggles appeared to continue. On January 9, 2013 --- six months after the Plan wanted N.M. out of residential treatment --- a case note states

> [N.M.'s] recent emotional struggles, manifesting in fights, horseplay, antagonizing, and theft were explored. Parents were open to exploring [N.M.'s] feelings pertaining to struggling with the last home visit. ….
> [N.M.] shared that he plans to repair with his staff, peers, and community for being violent.

(OPM02180, #16-12 at 20.) In contrast, defendant states in its statement of facts that on that same day, the case note stated N.M.'s mood was "content, calm, happy and excited" and that his behavior was "attentive, oriented, alert, engaged, poor eye contact, restless, vigilant, cooperative and honest." (#18 at ¶ 277, citing *Id.*)[7] Defendant does not discuss the details contained in the case notes nor does defendant explain or even refer to the "violent" episodes referred to in the case notes. Just days later, on January 22, 2013, a case note discusses when N.M. ran away from the facility overnight and N.M.'s father (the plaintiff) being ineffective in communicating with his son, resulting in N.M.'s "shut down" and the need for the therapist to "provide coaching" to family. (OPM02183, #16-12 at 23.) A January 28, 2013 case note refers to N.M.'s violent behavior with staff and N.M.'s desire to address problems with his violent outbursts, but defendant recites only the heading describing N.M.'s mood and behavior during therapy on this and other case

---

[7] Defendant actually cites to OPM00975, but that is the same document as OPM02180.)

notes --- not the references to violence discussed in therapy. (OPM02185, #16-12 at 25.) Similarly, although defendant describes a case note for April 23, 2013, defendant does not address the "Regroup Note" for the same date that describes N.M.'s violent interaction with a peer resulting in "an hour of regroup until he was able to talk about it." (OPM02191, #16-12 at 31.) That Regroup Note states that coaching tools and interventions used were "Therapeutic Touch and P.A.C.E." (*Id.*) Further, "recent violent behaviors" were discussed at a May 7, 2013 therapy session, but defendant highlights only his calm mood at therapy and makes only vague references to N.M.'s being placed on "general closeness" and "closeness-harm to others." (#18 at ¶¶ 417-18.) Even when defendant notes N.M.'s violent behavior, such as when he punched a wall on May 4, 2013 (#18 at ¶ 412), defendant fails to include that N.M. punched the wall so hard that he fractured his hand (OPM02209, #16-13 at 9).

Defendant thus minimizes or overlooks indicators that N.M.'s violent behavior was pervasive and could not be successfully managed outside the Residential Treatment program, as intensive therapy and coaching for both N.M. and his family was still required within the residential program. These violent episodes were still occurring --- but were managed with coaching tools and interventions by professionals --- in that structured environment. Again, N.M.'s psychiatrist noted that N.M. posed a risk of harm to himself and/or others for 22 days in July and September 2012 alone --- facts that defendant apparently fails to consider.

Although defendant focuses on provision of "safe" treatment for N.M., little attention is given to the type of treatment N.M. required. Documents pre-dating N.M.'s

admission to CALO reflect that residential treatment was needed to address N.M.'s problems at school and at home. One report furnished in March 2012 by James Dumesnil, MS, PLCC, CCFC, noted that N.M. had escalating issues of attachment and trust, conflict with peers, and was beyond parental control and experimenting with mood-altering substances. (OPM02140, #16-11 at 10.) Mr. Dumesnil observed that "when the structure is adequate" for N.M., "he can make it," but "when he is in an unstructured setting where peers have free time to triangulate, manipulate, and play the games of the schoolyard, he will quickly resort to paranoia, perception of victimization and subsequent, offending, attacking behavior." (OPM02141, #16-10 at 11.) "He needs for structure to be imposed from the outside, e.g., the structure inherent in a residential treatment program, with a residential treatment school." (OPM02142, #16-10 at 12.) Critically, Dumesnil stated that N.M.'s two prior "treatment episodes" had been "too brief," and that he would need time "to integrate new behaviors and patterns," suggesting "[t]his placement should be evaluated after 6 months, and continue to be evaluated each six months." (OPM02143, #16-10 at 13.)

Another report dated March 2012 by N.M.'s psychiatrist, Michael Shanker, MD, reflected a similar opinion that N.M.'s needs would be best served by a structured program. (OPM02149, #16-11 at 19.) A January 2012 report by Shirley Crenshaw, MSW, LCSW, stated a similar opinion that an improved outcome would be accomplished in a more structured residential setting --- as "[h]omebound services have been inadequate" and "unsuccessful." (OPM02152, #16-11 at 22.)

Although N.M.'s providers believed N.M. required long-term residential treatment evaluated at six-month intervals, the Plan authorized only two months at the outset. (*See* Def. Statement of Facts, #18 at ¶ 13.) The Plan and defendant justify that decision based on their read that N.M.'s problems were only "intermittent" and "manageable," but the administrative record is rife with facts that, although perhaps not everyday occurrences, indicate that his behavior was pervasive and was not "manageable" outside a structured facility equipped to handle children with N.M.'s disorders. Ultimately, N.M. was discharged on August 2, 2013, nearly 15 months after his admission, 13 months later than the Plan says was medically necessary, and two months before N.M.'s originally scheduled discharge date.

Defendant relies heavily on its expert Michael McManus, M.D., who is Board Certified in Child and Adolescent Psychiatry. The substance of Dr. McManus's report is one paragraph in length. He notes that N.M.'s ADHD and Bipolar Disorder symptoms had improved after two months of treatment and that his Reactive Attachment Disorder problems --- manifested apparently by "chronic interpersonal difficulties" --- had improved but "are chronic and are likely to require ongoing treatment and are unlikely to resolve in the context of Residential Treatment." (OPM02317, #16-16 at 17.) OPM states that Dr. McManus's opinion supports the decision that N.M.'s residential treatment was not medically necessary after July 15, 2012.

This Court determines that OPM fails to articulate a "rational connection between the facts found and the choice made" to be upheld. *See Bowman*, 419 U.S. at 285. After careful review of the extensive Administrative Record, the Court identifies two critical

problems with defendant's decision. First, Dr. McManus and defendant focus entirely on whether the treatment could have been "safely provided on an outpatient basis." As discussed above, defendant minimizes the violent, volatile details of N.M.'s psychiatric record in its reports while the Administrative Record reveals that N.M.'s behavioral issues were neither truly intermittent nor manageable by an unskilled caretaker. Neither McManus nor defendant address this patent discrepancy other than to blithely say the episodes were infrequent. Defendant does not articulate what an unacceptable frequency would be, but, regardless, this Court's review of the Administrative Record results in a different and unavoidable conclusion. As discussed above, defendant's emphasis on reciting N.M.'s "mood" and "behavior" at therapy sessions ignores the troubling, persistent references to N.M.'s struggles and violent outbursts that occurred outside the therapy session. Moreover, defendant overlooks documented periods when N.M.'s psychiatrist deemed N.M. to be a threat to himself or others in, at least, July and September 2012. These diagnoses, to the extent they can be called that, are entirely inconsistent with Dr. McManus's statement that N.M.'s "interpersonal difficulties and problematic behaviors had improved" between May and July 2012. To the extent defendant considered these facts and circumstances of the case, it is not apparent in the record.

Second, neither McManus nor the defendant ever address the matter of whether outpatient treatment would constitute "treatment" for this patient at all. N.M.'s providers clearly opined in early 2012 that N.M. needed a long-term structured residential treatment setting in order to experience effective therapy. The recommendation was that his

progress be evaluated at six month intervals. Instead, it appears N.M. was approved for only two months at the outset and that all subsequent reviews were geared toward supporting that apparently arbitrary decision. An InforMed letter stated that N.M.'s "care could have been safely delivered in a less restrictive setting." Dr. McManus's one-paragraph analysis conclusorily states simply that N.M.'s condition cannot be resolved through Residential Treatment. Those statements conflict both with N.M.'s earlier providers who recommended Residential Treatment and with the results of N.M.'s Residential Treatment, discussed below.

The Administrative Record reflects that Residential Treatment provided not only appropriate, safe interventional care for N.M.'s violent outbursts, but also the long-term structure and continuity N.M. needed to address his attachment issues. The Administrative Record shows Residential Treatment --- in CALO's highly structured environment with a highly skilled staff --- was critical to N.M.'s ability to improve his attachment issues. In fact, his discharge summary states that N.M. "has made progress along the following core goals: mood regulation, attachment, self concept, and social skills." Two lines on the discharge summary are illegible, but the remainder of the summary states that N.M.

> demonstrates a willingness to process through his feelings, particularly anger, loneliness, worthlessness, and frustration. He also demonstrated an increased ability to vocalize his needs and rely on the support of staff. [N.M.] initially arrived feeling that he "held everything in" and has made substantial progress being honest and open. N.M. was able to explore how often he feels lonely and left out. Regarding the core goal of attachment, [N.M.] has demonstrated an increased ability to communicate effectively and be honest and open with his parents. He demonstrates warmth and connection for his family and vocalizes a continued goal of restoring trust.

> [N.M.] and his family have evidenced an increased ability to repair breaks and to exhibit empathy and active listening. [N.M.] is also accepting of trust of control from parents, therapist, and staff. Regarding the core goal of self concept, [N.M.] has made substantial progress. [N.M.] has an ability to remain humble and motivated to work on areas of growth. [N.M.] has made moderate progress evidencing an ability to recognize his strengths. Lastly, regarding the core goal of social skills, [N.M.] has made substantial progress evidencing an ability to relate positively to others. [N.M.] has made progress with avoiding peer negativity in order to feel accepted, and instead, has established trusting and genuine relationships. [N.M.] has also been open and receptive to the feedback of others, and demonstrates a consistent ability to lead by example to demonstrate care and empathy.

(OPM02209, #16-13 at 9.) The Discharge Summary also states that although N.M. would continue regular therapeutic services, he could live interdependently with his family. Dr. McManus is perhaps correct that N.M.'s Reactive Attachment Disorder did not "resolve" such that anyone would say N.M. was "cured," but the long-term structured setting at CALO allowed N.M. the time and milieu to "integrate new behaviors and patterns," as Dumesnil prescribed prior to N.M.'s admission to CALO. Dumesnil said that that sort of reprogramming would take at least six months; CALO expected it would take 17 months; the Plan authorized only two months. Defendant does not explain why two months --- not the recommended six months or more --- was appropriate. InforMed and McManus's statements that treatment could have been safely delivered in a less restrictive setting wholly ignore the fact --- which earlier providers make clear --- that outpatient treatment would have been no treatment at all.

All of the documentation preceding N.M.'s admission supports that N.M. needed a more structured, more restrictive setting in which to achieve positive results. Defendant minimizes or overlooks clear evidence of N.M.'s threat to himself and others. Defendant

does not address the documented need for the very structured setting of Residential Treatment. Although this Court is cognizant of the narrow standard that must be applied in this case, the Court holds that, in light of the foregoing, defendant's action was without consideration and arbitrarily in disregard of the facts and circumstances of N.M.'s situation.

Accordingly,

**IT IS HEREBY ORDERED** that defendant's motion for summary judgment (#17) is **DENIED**.

**IT IS FURTHER ORDERED** that plaintiff's motion for summary judgment (#20) is **GRANTED**.

Dated this   17th   day of August, 2016.

_____
STEPHEN N. LIMBAUGH, JR.
UNITED STATES DISTRICT JUDGE